2003 UT App 300

STATE of Utah, Plaintiff and Appellee,

v.

Daniel J. PETERSON, Defendant and Appellant.

No. 20020341–CA.

Court of Appeals of Utah.

Sept. 5, 2003.

Margaret P. Lindsay, Aldrich Nelson Weight & Esplin, Provo, for Appellant.

Mark L. Shurtleff, Attorney Generals Office and Marian Decker, Assistant Attorney General, Salt Lake City, for Appellee.

Before Judges BENCH, DAVIS, and GREENWOOD.

OPINION

BENCH, Judge.

¶ 1 Peterson appeals his convictions for possession of methamphetamine, a third degree felony, in violation of Utah Code Ann. § 58–37–8(2)(a)(i), (4)(a), (c) (1998 & Supp. 2002), and possession of paraphernalia in a drug-free zone, a class A misdemeanor, in violation of Utah Code Ann. §§ 58–37a–5 and 58–37–8(4)(a), (c) (1998 & Supp.2002). On appeal, Peterson claims that the search of his coat and shoes exceeded the scope of an otherwise justified *Terry* frisk. *See Terry v.*

*Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We agree. We therefore reverse his convictions.

## BACKGROUND

¶ 2 The facts of this case are recited in the light most favorable to the trial court's findings from the suppression hearing. *See State v. Delaney,* 869 P.2d 4, 5 (Utah Ct.App.1994).

¶ 3 On December 28, 2001, Officer Russ Billings of the Provo City Police Department received an anonymous report that adults were using methamphetamine in the presence of children at a Provo residence. Officer Billings, along with several other officers, went to the residence to perform a welfare check on the children. A woman answered the door and informed Officer Billings that her adult daughter, Dawn Webster, was the tenant. Webster came to the door shortly thereafter and, according to Officer Billings, gave consent to the officers' entry and search of her apartment.

¶ 4 Officer Billings proceeded with Webster to a bedroom, upstairs and down a short hallway, where Webster's baby was sleeping. Webster and Officer Billings had been in the bedroom for approximately three or five seconds when Peterson unexpectedly emerged from the closet wearing light clothing and no shoes. Webster screamed out to her mother asking what the mother's boyfriend was doing in Webster's bedroom.[1] Startled by Peterson's emergence from the closet, Officer Billings stepped back and ordered Peterson to stop, turn around, and place his hands where the officer could see them. Peterson complied and Officer Billings then handcuffed him and patted him down for weapons. Finding no weapons, Officer Billings asked another officer to escort Peterson outside.

¶ 5 Within about sixty seconds of the patdown, Officer Billings noticed a coat on the floor of the closet where Peterson had been standing. Officer Billings asked a child who had entered the bedroom if the coat belonged to Peterson. The child responded affirmatively. Webster confirmed that the coat be-

longed to Peterson, and that Peterson had been wearing it when she answered the door. Officer Billings picked up the coat, intending to take it to Peterson. For safety purposes, he patted down the pockets of the coat. In doing so, Officer Billings felt a syringe in the right pocket. Officer Billings removed the syringe, which contained a brown liquid that later tested positive for methamphetamine. Meanwhile, another officer picked up a pair of shoes within three feet of the closet. Inside one of the shoes, the officer found a baggy full of syringes. Once the syringes were removed from Peterson's coat and shoes, Officer Billings took the items to Peterson who, by then, was standing on the front porch in the "extremely cold" December weather. Peterson was then arrested for drug offenses.

¶ 6 Before trial, Peterson moved to suppress all evidence found in his coat and shoes, claiming it was obtained by an illegal search and seizure. The trial court denied Peterson's motion to suppress, finding that the search of the coat and shoes was within the scope of a lawful *Terry* frisk. Peterson was subsequently convicted of possession of methamphetamine and paraphernalia. Peterson appeals.

## STANDARD OF REVIEW

¶ 7 "The factual findings underlying a trial court's decision to grant or deny a motion to suppress evidence are reviewed under the deferential clearly-erroneous standard, and the legal conclusions are reviewed for correctness, with a measure of discretion given to the trial judge's application of the legal standard to the facts." *State v. Moreno,* 910 P.2d 1245, 1247 (Utah Ct.App.1996).

## ANALYSIS

¶ 8 "The Fourth Amendment of the United States Constitution guarantees the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *State v. Lopez,* 873 P.2d 1127, 1131 (Utah 1994)

---

1. Webster knew Peterson was in the apartment, but thought he was in the kitchen with her moth-

er.

(quoting U.S. Const. amend. IV). However, "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) (quotations and citation omitted).

¶ 9 "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a pat-down or frisk "to determine whether the person is in fact carrying a weapon." *Terry,* 392 U.S. at 24, 88 S.Ct. 1868. However, such search must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby." *Id.* at 26, 88 S.Ct. 1868. Professor LaFave explains that "the limited search permitted by *Terry,* it is important to remember, is to find weapons" that might be used to assault the officer. Wayne R. La-Fave, 4 *Search & Seizure Law: A Treatise on the Fourth Amendment,* § 9.5(b), at 274 (3d ed.1996). Utah courts have consistently upheld limited searches for weapons under *Terry.* In *State v. Bradford,* 839 P.2d 866 (Utah Ct.App.1992), we stated that, under *Terry,* "when an officer reasonably believes a suspect is dangerous and may obtain immediate control of weapons, a protective search is justified." *Id.* at 870 (citation omitted). The Utah Supreme Court, in *State v. Roybal,* 716 P.2d 291 (Utah 1986), held that an officer may conduct a protective weapons search only if "a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger." *Id.* at 293 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

¶ 10 In determining what is reasonable during a pat-down search or frisk, we must ask first "whether the officer's action was justified at its inception," and second, "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20, 88 S.Ct. 1868. Peterson concedes that the frisk of his person was justified at its inception. Therefore, we limit our analysis to the scope of the search.

¶ 11 The second prong of the *Terry* analysis asks whether the scope of the search was reasonably related to the circumstances that justified the interference. *See id.; accord State v. Chapman,* 921 P.2d 446, 450 (Utah 1996); *State v. Johnson,* 805 P.2d 761, 763 (Utah 1991). In other words, we must determine whether the subsequent action of searching the coat and shoes was within the scope of the frisk conducted on Peterson's person.

¶ 12 Utah courts have addressed the issue of scope in different contexts. In *Johnson,* 805 P.2d at 764, the Utah Supreme Court held that running a warrants check on a passenger in an automobile that had been properly stopped exceeded the appropriate scope of detention. Similarly, in *State v. White,* 856 P.2d 656 (Utah Ct.App.1993), we held that the police officer exceeded the scope of a *Terry* frisk when the need for a frisk had dissipated. Furthermore, in *State v. Valdez,* 2003 UT App 100, 68 P.3d 1052, we held that a police officer's request for a defendant's identification during the arrest of another person "exceeded the scope of the reasons justifying the initial detention and unnecessarily expanded its duration in scope." *Id.* at ¶ 8. In fact, the scope of the detention was "limited to ensuring that defendant had no weapon in his hands and was in no position to violently interfere with the arrest." *Id.* at ¶ 22.

¶ 13 As in *Terry* and the above cases, the authority and scope of a frisk for weapons carried out by Officer Billings must be "narrowly drawn." *Terry,* 392 U.S. at 27, 88 S.Ct. 1868. The facts of the present case are undisputed. After Officer Billings entered the room, Peterson suddenly emerged from the closet. Fearing for his own safety and the safety of others present, Officer Billings lawfully and justifiably conducted a pat-down of Peterson's person. After ensuring that Peterson did not have a weapon, Officer Billings asked another officer to escort Peterson outside. Peterson was then removed from the room and ultimately from the premises. There then remained no reasonable expectation or apprehension that Peterson could access a weapon or would otherwise interfere with the welfare check. The circumstances

that justified the pat-down, namely the search for weapons, were no longer present when Officer Billings searched the coat that was lying on the floor. Therefore, when Officer Billings picked up the coat and patted it down for weapons, he exceeded the scope of the lawful frisk. The evidence seized from the coat and shoes is therefore not admissible.

## CONCLUSION

¶ 14 We are persuaded that the search of Peterson's coat exceeded the scope of a *Terry* frisk. The safety and weapons concerns were no longer present after Peterson had been frisked and removed from the premises. We therefore reverse the convictions.

¶ 15 WE CONCUR: JAMES Z. DAVIS and PAMELA T. GREENWOOD, Judges.