2005 UT 17

**STATE of Utah, Plaintiff and Petitioner,**

v.

**Daniel J. PETERSON, Defendant and Respondent.**

No. 20030802.

Supreme Court of Utah.

March 22, 2005.

Mark L. Shurtleff, Att'y Gen., Marian Decker, Asst. Att'y Gen., Salt Lake City, for plaintiff.

Margaret P. Lindsay, Provo, for defendant.

WILKINS, Associate Chief Justice:

¶1 In 2002, Daniel Peterson was charged with illegal use or possession of a controlled substance, a third degree felony, and use or possession of drug paraphernalia, a class A misdemeanor. During the pretrial evidentia-

ry hearing, Peterson moved to suppress evidence obtained in the course of a police search of his discarded clothing, arguing that the search violated his constitutional rights under the Fourth Amendment. The trial judge denied his motion, finding that the search was properly conducted pursuant to a protective weapons-search frisk. At trial, Peterson was convicted of both charges. He appealed his convictions to the Utah Court of Appeals, contending that the search that uncovered the incriminating materials was illegal because it fell outside the scope of the permissible protective frisk of his person. The court of appeals agreed and reversed his convictions. We grant the State's Petition for Certiorari and now affirm.

## BACKGROUND

¶ 2 On the afternoon of December 28, 2001, the Provo City police received an anonymous tip that illegal drugs were being used in the presence of children inside a Provo residence. Officer Russell Billings, accompanied by four other officers, was dispatched to the address the anonymous caller had given. At the residence, the officers explained to the occupant, Dawn Webster, that they had received a report that drugs were being abused in the presence of children, and that they wanted to conduct a welfare check on the children in the home. Ms. Webster agreed to permit the officers to conduct this check and led them inside. The officers followed Ms. Webster upstairs and down a short hallway into a bedroom in which a baby was sleeping. The blinds in the room were closed and the bedroom light was off, but the room was not completely dark, as it was approximately one o'clock in the afternoon and the hallway light was on.

¶ 3 A few seconds after the officers entered the bedroom, Peterson emerged suddenly from an open closet, startling the officers and Ms. Webster. The precise order of the next events is unclear from the record, but they seem to coincide. Ms. Webster called out to her mother for an explanation as to why her mother's boyfriend, whom she had thought was in the kitchen, was in Ms. Webster's bedroom. The officers meanwhile had ordered Peterson to turn around and put

his hands in the air. He complied. The officers then cuffed Peterson's hands behind his back and frisked him, after which Officer Billings requested that another officer remove Peterson from the apartment.

¶ 4 Within approximately sixty seconds thereafter, the following occurred: Officer Billings noticed a man's jacket and shoes near the closet where Peterson had been standing. Children inside the home and Ms. Webster confirmed that the articles belonged to Peterson. Concerned that Peterson, lightly clad and shoeless, would need his jacket and shoes to protect him against the twenty-degree weather outside, Officer Billings decided to take the jacket and shoes to the defendant. To ensure that he would not unknowingly transport a weapon to Peterson, Officer Billings first conducted a "protective frisk" of the jacket. In doing so, he felt the contours of a syringe, later lab tests of which confirmed that the brown liquid observed inside was, as the officer suspected upon visual examination, methamphetamine. Another officer picked up the shoes and discovered a small plastic bag containing clean syringes "stuffed inside" one of the shoes.

¶ 5 The officers then arrested Peterson for drug offenses. At the pretrial evidentiary hearing, the trial judge denied Peterson's motions to suppress the evidence discovered in the jacket and shoes. The judge determined that the search of Peterson's clothing fell within the parameters of a lawful protective frisk and that the evidence was therefore admissible. A jury convicted Peterson of the drug charges.

¶ 6 The court of appeals reversed the convictions, concluding that the search was unconstitutional and that the evidence should have been suppressed. *State v. Peterson*, 2003 UT App 300, ¶ 14, 77 P.3d 646. The court of appeals "limit[ed][its] analysis to the scope of the search," since the defendant conceded that the initial frisk of his person was lawful. *Id.* at ¶ 10. Focusing on this single issue, the court determined that after Peterson had been frisked, cuffed, and removed from the room, the "circumstances that justified the pat-down, namely the search for weapons, were no longer present." *Id.* at ¶ 13.

¶7 According to the court of appeals, "[t]here then remained no reasonable expectation or apprehension that Peterson could access a weapon or would otherwise interfere with the welfare check." *Id.* The court of appeals therefore held that the frisk of the jacket exceeded the permitted scope of the initial frisk and violated Peterson's Fourth Amendment rights. *Id.* The court of appeals accordingly ruled that the evidence seized thereby was improperly admitted and reversed Peterson's conviction. *Id.* at ¶¶ 13–14.

## ANALYSIS

¶8 "When exercising our certiorari jurisdiction, we review the decision of the court of appeals and not that of the trial court ... for correctness." *State v. Warren*, 2003 UT 36, ¶ 12, 78 P.3d 590 (internal quotations omitted). "When a case involves the reasonableness of a search and seizure, [appellate courts] afford little discretion to the [trial] court because there must be state-wide standards that guide law enforcement and prosecutorial officials." *Id.* at ¶ 12 (internal quotation and citation omitted); *see also State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699 (clarifying that we apply correctness review to Fourth Amendment determinations).

¶9 In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court established the standard under which police may conduct warrantless protective searches to ensure officer safety during encounters in which a person is detained but not arrested. Recognizing that "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties," the Court sought to create a rule that would allow police officers to "take necessary measures" to protect themselves against harms presented by individuals whom the officers reasonably suspect are "armed and presently dangerous." *Id.* at 23–24, 88 S.Ct. 1868. Under this rule, officers may perform a protective frisk of such an individual's person for the sole purpose of "discover[ing] ... weapons which might be used to harm the officer or others nearby." *Id.* at 26, 88 S.Ct. 1868.

This procedure has come to be called a "*Terry* frisk."

¶10 In *Terry*, the Court emphasized that police may conduct a protective frisk only when they have reasonable suspicion that the detained individual is armed and dangerous. *Id.* at 27, 88 S.Ct. 1868. In defining the reasonable suspicion requisite in these cases, the Court explained that "[t]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 26, 88 S.Ct. 1868.

¶11 Thus, reviewing courts are to evaluate whether an officer acted reasonably in conducting a protective frisk by looking "not to [the officer's] inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.* "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. Whether an officer has reasonable suspicion to subject an individual to a *Terry* stop and frisk is "evaluated objectively according to the totality of the circumstances." *State v. Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590 (citing *Terry*, 392 U.S. at 21, 88 S.Ct. 1868).

¶12 Courts must apply a two-pronged analysis to evaluate whether a warrantless protective search was permissible under *Terry*. The court must first determine "whether the officer's action was justified at its inception." *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868. Next, the court must assess "whether [the action] was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. 1868. Because the only permissible objective of the *Terry* frisk is the discovery of weapons that may be used against the officer or others, "'a protective search [that] goes beyond what is necessary to determine if the suspect is armed ... is no longer valid under *Terry* and its fruits will be suppressed.'" *Warren*, 2003 UT 36 at ¶ 13, 78 P.3d 590 (quoting *Minnesota v. Dicker-*

*son*, 508 U.S. 366, 373, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)).

¶ 13 Peterson concedes that the initial stop and frisk of his person was proper under the *Terry* doctrine. The only question on appeal, then, concerns the second prong of the analysis: whether the subsequent frisk of his discarded jacket and shoes fell within the scope of the lawful initial *Terry* frisk of Peterson himself. Peterson argues that Officer Billings exceeded the scope of the original *Terry* frisk when he frisked the unworn jacket and shoes because, at the time he did so, Peterson could not have accessed a weapon hidden inside. Thus, the search did not advance any officer safety objective.

¶ 14 Further, he argues, police officers cannot create the exigent circumstances that make a protective search necessary. It was the officers' decision to detain Peterson outside in cold weather and the officers' decision to solve that problem by providing Peterson with his coat. It would be wrong, Peterson argues, to allow the police to enlarge the parameters of a lawful frisk by simply creating circumstances, and manufacturing solutions to those circumstances, that introduced items that were previously out of reach—and outside the scope of a *Terry* frisk—into both the suspect's grasp and the scope of a frisk.

¶ 15 The State, on the other hand, argues that the officers were entitled under *Terry* and its progeny to frisk the jacket and shoes for weapons because, though not within Peterson's reach at the time the frisk was conducted, the circumstances of the detention required the officers to provide the items to him. Specifically, the State relies on the rule the United States Supreme Court announced in *Michigan v. Long*, 463 U.S. 1032, 1052, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), where the officers were permitted to conduct a protective weapons search of the grab area inside a stopped vehicle, even though the detained individual could not access the interior of the car during the detention, to ensure that the individual would not access a weapon upon reentering his car when the stop had terminated.

¶ 16 The State argues that the reasoning in *Long,* allowing police to conduct a protective search of an area to which the detained individual will soon, but does not yet, have access, extends to the circumstances here, where the police were about to provide Peterson with his jacket during the detention in order to accommodate weather conditions outside. In the State's view, because Peterson would imminently be in receipt of his jacket and any weapon it might contain, frisking the jacket was a reasonable safety precaution under the circumstances. A ruling to the contrary, the State argues, would leave police in the impossible situation of choosing between officer safety and humane treatment of detained individuals.

¶ 17 The court of appeals rejected the State's argument, finding instead that once Peterson was removed from the room, "[t]here then remained no reasonable expectation or apprehension that Peterson could access a weapon or would otherwise interfere with the welfare check." *State v. Peterson,* 2003 UT App 300, ¶ 13, 77 P.3d 646. Thus, the search of the jacket fell outside the scope of a *Terry* frisk, and any evidence obtained thereby was inadmissible. *Id.* The court of appeals did not explicitly address whether the outdoor detention gave rise to an exigent circumstance that permitted the police to provide Peterson with his jacket and whether a *Terry* search would be justified under such circumstances. We affirm the court of appeals and supply further analysis on this question to eliminate any ambiguity that may remain.

¶ 18 As discussed above, in order for the police to have acted properly in frisking the discarded jacket for weapons, the jacket would have had to have been either within Peterson's grab area or imminently within his reach. *See Long,* 463 U.S. at 1051–52, 103 S.Ct. 3469 (holding that officers may search the area of an automobile that will be "within [a suspect's] immediate grasp" when the suspect reenters his car). The jacket and shoes were not within Peterson's grab area, since he had already been removed from the room when the officers noticed it, but they would imminently be in his possession, since the police determined to take them to him. The critical issue here is whether the officers' decision to provide Peterson with his jacket and shoes can insert

those items into the scope of the permissible frisk.

¶ 19 As a preliminary matter, we note that courts are divided on the issue of whether police may frisk items in the possession of individuals who themselves are lawfully subject to a *Terry* frisk. *See* 4 Wayne R. La-Fave, *Search and Seizure* § 9.6(e), at 672–74 (4th ed.2004). Some courts have allowed such frisks, while others have held that officers are instead required to neutralize any threat such items potentially pose by "simply putting [the items] out of . . . reach during the period of the encounter." *Id.* at 673; *see Commonwealth v. Pagan*, 440 Mass. 62, 793 N.E.2d 1236, 1239–40 (2003) (discussing both arguments); *see also United States v. Lewis*, 486 A.2d 729, 733 (D.C.1985) (holding that, under the precise circumstances of the case, officers could not search an item that had been placed safely out of reach); *Berry v. State*, 704 N.E.2d 462, 465 (Ind.1998) (same).

¶ 20 Courts that have permitted searches of items that could have been placed out of reach generally have done so when it was necessary that the detainee have access to the item in order to effectuate the purposes of the investigatory stop, such as when the detainee could only provide requested identification by reaching into a bag or other container that may have also concealed a weapon. LaFave, *supra*, § 9.6(e), at 672–73 (citing *Pagan*, 793 N.E.2d at 1240 (noting that where "the container that could have contained a weapon also contained the identification that the police were asking the defendant to produce," police could confirm that no weapons were concealed inside before allowing the defendant to have access to it)).

¶ 21 We are asked to answer a slightly narrower question than the one the above-mentioned courts addressed. We do not need to decide whether the police must remove items from a detainee's custody and place them out of reach instead of conducting a frisk of those items. Rather, we address whether the *Terry* doctrine supports a frisk of items only in the custody of a suspect because the police gave the items to him, in the absence of a request and an investigatory need, after collecting the items from an area

remote to the precise spot of detention. Other courts' discussions, and divisions, on the broader issue of whether *Terry* requires police to remove potentially weapon-concealing items from a suspect's possession, or whether *Terry* instead permits a frisk of such items, is useful to our analysis because they underscore the narrowness with which courts are to circumscribe *Terry* frisks.

¶ 22 The State argues that the case at bar presents a unique situation in which the police were required to introduce items they feared may contain weapons into the detainee's grab area. The State's argument would require us to find that providing Peterson with his jacket so that he could protect himself from the weather during the outdoor detention is similar to allowing a suspect to reach into an unfrisked purse or bag to retrieve identification. We do not, however, find the situations to be analogous.

¶ 23 The State's position would require us not only to suggest that the police need not neutralize potential dangers by putting a suspect's items out of reach during the course of the encounter, but also to rule that the police may themselves introduce items collected from remote areas into the suspect's direct possession for non-investigatory purposes. Expressing no opinion on whether the police must place a suspect's possessions out of reach instead of performing a frisk, we decline to extend the *Terry* doctrine to permit searches of items the police themselves retrieved from other areas to place in a suspect's possession for non-investigatory reasons. We find that the police here were confronted with a situation distinguishable from one in which items already in the possession of the suspect, or returned to the suspect's custody in order to facilitate the investigation, must be frisked for protective purposes.

¶ 24 Police are permitted to frisk items before returning them to a suspect when the suspect has claimed he needed the items to comply with police directives. *See Pagan*, 793 N.E.2d at 1239–40 (police could frisk the bag for weapons rather than set it aside because the suspect claimed his identification, which they requested, was inside). In such instances, the suspect's possession of

the item was necessary to effectuate the essential purposes of the stop: identification and verification of information provided. *See* LaFave, *supra,* § 9.6(e), at 673. Where such is the case, it is appropriate for officers, reasonably fearing for their safety, to conduct a *Terry* frisk of the item before allowing the suspect to reach inside to retrieve identification.

¶ 25 Here, however, the officers provided Peterson with his jacket and shoes only to make him more comfortable during the detention, not to retrieve any identification or other information essential to the stop, nor to indulge a request from their suspect, since Peterson never asked for the items. The State claims that the officers had to retrieve Peterson's jacket and shoes in order to protect him from the weather, and because they had to give him those items, a frisk thereof fell within the lawful scope of the frisk of his person. Even if the severity of the weather was such that providing Peterson with some form of protection rose to the level of an investigatory purpose of the stop, we could only hold the frisk permissible if the jacket and shoes truly were essential in the sense that they were the only means by which to accomplish that important end.

¶ 26 Here, to the contrary, we conclude that the officers could have assuaged any concerns about Peterson's comfort in the winter weather in a number of permissible and reasonable ways, including providing him with a blanket, police jacket, or some other neutral item; relocating him to another area inside the residence; or temporarily placing him in the back of a squad car. In the face of these reasonable alternatives, we cannot say that the officers "had" to provide Peterson with his jacket, even if the weather conditions did require some form of relief in order to conduct the stop. It would be inappropriate to recognize a police authority under *Terry* to seize and frisk a suspect's possessions when it was the police who retrieved the items, in the absence of an objective concern that the suspect would be able to access the item during or immediately after the stop, when the suspect did not request the items, and when the items were not necessary to effectuate the stop.

¶ 27 Though we do not wish to second-guess the split-second decisions of the officer on the beat, *Terry,* 392 U.S. at 20, 88 S.Ct. 1868, we believe that, under the specific facts of this case, we are not requiring the police to place their safety in jeopardy, nor are we micro-managing police protocol, when we decline to grant them the authority they seek here. There were sufficient reasonable alternatives to seizing Peterson's coat and shoes, in the absence of a request from him, to render that seizure and subsequent search unnecessary to the investigation and to their stated goal of making Peterson more comfortable. Since we find that the jacket and shoes were not necessary to the stop, the officers should have pursued other solutions to the problem of the outdoor detention of a lightly-clad individual.

¶ 28 While the good faith intent of these officers is not in question, we recognize that a rule that permits the police to unilaterally introduce items into a detainee's grab area for reasons not essential to the purpose of the stop, and then to conduct a protective frisk of those items, is a rule that could be subject to serious abuse. Officers would need only provide a suspect with an item not relevant to the investigation that would otherwise fall outside the scope of a *Terry* frisk in order to thereby bring the item within permissible parameters so that they could perform a search of it.

¶ 29 Essentially, officers would be able, for non-investigatory reasons, to put themselves in the very danger that they would then utilize the frisk to dispel, when they could have achieved the same non-investigatory goal by means that would not have endangered them in the first place. Such a rule as the State proposes is surely repugnant to our Fourth Amendment jurisprudence, which requires us to "narrowly draw[ ]" the scope of these protective searches that are justified only by concerns for officer safety. *Id.* at 27, 88 S.Ct. 1868.

¶ 30 To be clear, we are not requiring officers to take less intrusive measures to ensure their safety when faced with a potential threat. Instead, we are simply holding that, when conducting a *Terry* stop, officers may not unnecessarily place themselves in

potential danger by providing their suspect with an item that may conceal a weapon when that item is not essential to the purposes of the stop or to further the investigation, and then, under the auspices of *Terry*, to dispel that danger by performing a protective frisk of the very item they provided. Police officers in such situations as presented here must utilize means to achieve their non-investigatory goals that do not implicate constitutional rights when such measures are reasonably available. We find that alternatives were reasonably available to the officers in this case.

¶ 31 Thus, we hold that where the officers could have resolved the element of discomfort occasioned by Peterson's outdoor detention through other reasonable and less intrusive means, providing him with his jacket and shoes was not a necessary measure. As such, the scope of the permissible *Terry* frisk did not expand to embrace those items, previously and unarguably outside the bounds of a permissible frisk.

## CONCLUSION

¶ 32 The search of Peterson's jacket and shoes was conducted after the items were out of Peterson's reach, thus eliminating any danger that Peterson could retrieve a weapon concealed inside. The police were not permitted to introduce those items into Peterson's grab area for the sole purpose of making him more physically comfortable during the course of his detention, the contours of which they designed, as it was not necessary to do so for investigatory reasons because there were other reasonable and less intrusive means to resolve the issue. Affirmed.

¶ 33 Chief Justice DURHAM, Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Associate Chief Justice WILKINS' opinion.