2009 UT App 50

STATE of Utah, Plaintiff and Appellee,

v.

Jody Dale PARKE, Defendant
and Appellant.

No. 20070840–CA.

Court of Appeals of Utah.

Feb. 26, 2009.

Michael Misner and Lori J. Seppi, Salt Lake City, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Jeffrey S. Gray, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before Judges BENCH, BILLINGS,[1] and ORME.

## OPINION

ORME, Judge:

¶ 1 This appeal presents the question of whether a protective frisk is constitutional when the facts show that the police officer effectuating a traffic stop subjectively believed the driver's shoulder movement indicated that the driver may have been hiding a weapon or narcotics in his waistband area; the driver became "somewhat agitated" and questioned the police officer's order to place both of his hands outside the window; and in the police officer's experience, the area he patrolled was "very dangerous." When objectively considering the totality of the circumstances, we conclude these facts do not support a reasonable, articulable suspicion that the driver was armed and dangerous. Accordingly, we reverse the trial court's denial of Appellant Jody Parke's motion to suppress evidence.

## BACKGROUND[2]

¶ 2 At around 9:30 p.m. on May 2, 2007, Officer Jimmy Cole Anderson observed a vehicle pull out of a gas station parking lot and onto a city street "without stopping and checking for traffic."[3] Officer Anderson then initiated a traffic stop and pulled the vehicle over in a nearby movie theater parking lot. Parke was the only occupant of the vehicle. As Officer Anderson exited his vehicle, he saw Parke make a "shoulder movement . . . which caught [his] attention." Officer Anderson testified: "I saw the driver what appeared to me as making . . . movements as in reaching towards [his] waistband area." He further testified that "it's a very dangerous area that we work and . . . with those movements in my past experiences . . . I have found people to be concealing either weapons or narcotics." He accordingly "ordered [Parke] to put his hands outside the window so [he] could approach safely." Upon receiving this order, "[Parke] became somewhat agitated" and "questioned" the order, "which . . . raised [Officer Anderson's] suspicions a little bit more." Despite being unhappy about the order, Parke did comply and placed his hands outside the window. A back-up officer arrived around that time, and Officer Anderson asked Parke to step outside the vehicle so Officer Anderson could "perform a weapons search of his person [and] deal with him in . . . safety."

¶ 3 During the search of Parke's person, Officer Anderson "felt what appeared . . . to be [a] knife in [Parke's] pocket," and Parke confirmed it was a knife. Officer Anderson removed from Parke's pocket a pocket knife on a chain, to which a capsule was also attached. When Officer Anderson extended his search to the vehicle, *see generally Michigan v. Long,* 463 U.S. 1032, 1051–52, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (upholding an officer's search of the grab area of a vehicle, even while the driver was temporari-

---

1. Judge Billings, who retired on December 31, 2008, participated in resolving this appeal and voted to concur in this opinion prior to her retirement.

2. "We recite the facts in detail because the legal analysis in a search and seizure case is highly fact dependent." *State v. Warren,* 2003 UT 36, ¶ 2, 78 P.3d 590.

3. Parke assails two of the trial court's factual findings that were based on Officer Anderson's testimony. Because our disposition of this case is the same even accepting the challenged factual findings as valid, we do not specifically address whether these factual findings are clearly erroneous.

ly detained outside the vehicle, because the officer needed to make sure the defendant would be unable to access a weapon during the detention or following reentry of the vehicle); *State v. Peterson*, 2005 UT 17, ¶ 15, 110 P.3d 699 (discussing *Michigan v. Long* ), and opened the driver's side door, he saw "a pink baggie of a white crystallized substance" in plain view "right along the frame of the vehicle" in the area "between the door and [the] driver's seat." Suspecting that the baggie contained methamphetamine, Officer Anderson placed Parke under arrest. During the search incident to arrest, Officer Anderson discovered another baggie containing a crystallized substance in the capsule attached to the pocket knife chain.[4]

¶ 4 The State charged Parke with unlawful possession of a controlled substance, a third degree felony. *See* Utah Code Ann. §§ 58–37–4(2)(b)(iii)(B) (2007), 58–37–8(2)(a)(i), (2)(b)(ii) (Supp.2008). Following the denial of his motion to suppress evidence, Parke entered a conditional plea, admitting guilt to one count of unlawful possession of a controlled substance but reserving his right to appeal the trial court's ruling on his motion to suppress evidence. *See State v. Sery*, 758 P.2d 935, 938–39 (Utah Ct.App.1988). This appeal followed.

## ISSUE AND STANDARD OF REVIEW

¶ 5 The sole issue on appeal is whether Officer Anderson's protective frisk of Parke was constitutional under the Fourth Amendment. "On review of both criminal and civil proceedings, we accept the trial court's findings of fact unless they are clearly erroneous." *Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988). "We review the trial court's ruling on a motion to suppress for correctness, without deference to the trial court's application of the law to the facts." *Layton City v. Oliver*, 2006 UT App 244, ¶ 11, 139 P.3d 281. *See State v. Brake*, 2004 UT 95, ¶ 15, 103 P.3d 699 ("We abandon the standard which extended 'some deference' to the application of law to the underlying factu-

al findings in search and seizure cases in favor of non-deferential review.").

## ANALYSIS

¶ 6 Under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "an officer may perform a protective frisk" when he or she "ha[s] a valid reason for stopping the person" and "reasonably believes [the] person is armed and presently dangerous to the officer or others." *State v. Warren*, 2003 UT 36, ¶ 13, 78 P.3d 590 (citations and internal quotation marks omitted). We evaluate "[t]he reasonableness of both the stop and the frisk ... objectively according to the totality of the circumstances," *id.* ¶ 14, and consider "whether the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate," *id.* (citation and internal quotation marks omitted).

> [An] officer must be able to point to specific facts which, considered with rational inferences from those facts, reasonably warrant the intrusion.... [D]ue weight must be given, not to [an officer's] inchoate and unparticularized suspicion or hunch, but to specific reasonable inferences which [an officer] is entitled to draw from the facts in light of his experience.

*Id.* (final two alterations in original) (citations and internal quotation marks omitted).

¶ 7 In this case, the validity of the stop is not challenged, so we consider only whether the officer reasonably believed Parke to be "armed and presently dangerous." *Id.* ¶ 13 (citation and internal quotation marks omitted). As discussed in further detail below, the facts taken as a whole do not provide adequate support for a determination that Officer Anderson had a reasonable, articulable suspicion to support the protective frisk. When considering the totality of the circumstances, we conclude that the frisk was unconstitutional.

¶ 8 The relevant facts are as follows: (1) Officer Anderson effectuated a traffic stop,

---

4. The parties stipulated at the hearing that the lab results confirmed the baggies contained

methamphetamine.

and traffic stops are inherently dangerous, *see id.* ¶ 22 ("[T]he inherent dangerousness of all traffic stops is a factor to be considered in the totality of the circumstances analysis."); (2) based on his previous experiences when seeing such a movement, Officer Anderson subjectively believed that Parke may have been hiding a weapon or drugs in his waistband area because of Parke's shoulder movement, *see id.* ¶ 21 ("An officer's determination that a person may be armed and dangerous, like an officer's subjective interpretation of the facts to determine that a crime has been or is being committed, is one of several possible articulable facts a court may consider as part of the totality of the circumstances."); (3) Parke became "somewhat agitated" and questioned Officer Anderson's order to place his hands outside the vehicle, *see Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion."); *but see State v. Lafond*, 2003 UT App 101, ¶ 20, 68 P.3d 1043 ("[B]ecause nervous behavior ... is consistent with innocent as well as criminal behavior, ... [w]e are ... reluctant to assign any particular importance to nervous conduct when determining reasonable suspicion in the context of a *Terry* frisk for weapons[.]") (citation and internal quotation marks omitted), *cert. denied*, 72 P.3d 685 (Utah 2003); (4) according to Officer Anderson, the area he patrolled was "very dangerous," *see Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 ("[T]he fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis.") (citation omitted); and (5) Officer Anderson ordered Parke to step outside the vehicle, *see Warren*, 2003 UT 36, ¶ 22, 78 P.3d 590 (stating that "both the inherent dangerousness of the traffic stop and any reduction in that danger resulting from ordering the occupants out of the vehicle should be factored into the totality of the circumstances analysis").

 ¶ 9 With regard to the first fact, while traffic stops are inherently dangerous, *see id.*, a routine traffic stop is not one of those dangerous "[c]rimes that, by their nature, suggest the presence of weapons[, e.g.,] 'robbery, burglary, rape, assault with weap-

ons, homicide, and dealing in large quantities of narcotics.'" *Lafond*, 2003 UT App 101, ¶ 19, 68 P.3d 1043 (quoting Wayne R. LaFave, *Search and Seizure* § 9.5(a), at 255–56 (3d ed. 1996) (additional citation omitted)). Rather, with a "lesser traffic offense[ ]," like the one in this case, "there must be particular facts which lead the officer to believe that a suspect is armed" and dangerous. *Id.* (citations and internal quotation marks omitted). *Accord Brake*, 2004 UT 95, ¶ 32, 103 P.3d 699. "[D]espite the danger that inheres in on-the-street encounters and the need for police to act quickly for their own safety, ... *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 334–35 n. 2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

 ¶ 10 Turning to the second fact listed above, although Officer Anderson believed Parke's shoulder movement indicated that Parke may have been hiding a weapon or drugs in his waistband—and only the former is relevant in considering the propriety of a *Terry* frisk in any event—we conclude that this belief was a "hunch" or an "inchoate suspicion," not a "particular fact" or "particular inference" that justified the protective frisk of Parke. A police officer's subjective belief is just one factor in the totality of the circumstances analysis and is not determinative of whether reasonable suspicion actually existed. *See Warren*, 2003 UT 36, ¶ 21, 78 P.3d 590. While an officer's interpretation of a suspect's actions and movements is relevant because an officer draws upon his or her experience in that interpretation, *see id.*, an officer's interpretation at times may be colored by preconceived notions about certain gestures he or she expects to see upon approaching a suspect. *See State v. Holmes*, 774 P.2d 506, 511 (Utah Ct.App.1989) (" 'From the viewpoint of the observer, an innocent gesture can often be mistaken for a guilty movement. He must not only perceive the gesture accurately, he must also interpret it in accordance with the actor's true intent. But if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be assigned a meaning only in their context. Yet the observer may

view that context quite otherwise from the actor: not only is his vantage point different, he may even have approached the scene with a preconceived notion—consciously or subconsciously—of what gestures he expected to see and what he expected them to mean. The potential for misunderstanding in such a situation is obvious.' ") (quoting *People v. Superior Court,* 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449, 455 (1970)).

¶ 11 Moreover, the Utah Supreme Court has previously determined that "[m]ere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity," *State v. Schlosser,* 774 P.2d 1132, 1137 (Utah 1989), and that "[a] search based on ... common gestures and movements is a mere 'hunch,' not an articulable suspicion that satisfies the Fourth Amendment," *id.* at 1138. *See State v. White,* 856 P.2d 656, 661 (Utah Ct.App.1993). The Utah Supreme Court's comments in *State v. Schlosser,* 774 P.2d 1132 (Utah 1989), are insightful even though the Court was focused on whether there was articulable suspicion of criminal activity by Schlosser rather than on whether there was articulable suspicion that Schlosser was armed:

> Schlosser's movements, turning to the left and to the right, appearing fidgety, bending forward, and turning to look at the officer, do not, without more, show a reasonable possibility that criminal conduct had occurred or was about to occur. Schlosser may have been attempting to locate a driver's license. He could have been preparing for conversation with the officer by turning down the volume on the radio or extinguishing a cigarette. He may also have been putting away food and beverages, changing a baby's diaper, putting on the parking brake or doing a host of other innocuous things.

*Id.* at 1138. As in *Schlosser,* Parke may have simply been reaching for his wallet to have his driver's license ready, rather than reaching for a weapon. Accordingly, while an officer's interpretation of a suspect's move-

ments is a subjective factor we consider, when it is impossible to draw a clear inference regarding the nature of the movement, any interpretation of criminality or danger in such a movement by a police officer is just a "hunch" or "inchoate suspicion."

¶ 12 The third fact we consider is that Parke became "somewhat agitated" and questioned Officer Anderson's order to place both of Parke's hands outside the window. "When confronted with a traffic stop, it is not uncommon for drivers ... to be nervous and excited[.]" *Id.*

> [B]ecause nervous behavior ... is consistent with innocent as well as criminal behavior, such conduct can be afforded no weight in determining a detaining officer's reasonable suspicion of criminal activity. We are likewise reluctant to assign any particular importance to nervous conduct when determining reasonable suspicion in the context of a *Terry* frisk for weapons, at least ... when the nervousness is unaccompanied by any hostile, threatening, or aggressive behavior.

*Lafond,* 2003 UT App 101, ¶ 20, 68 P.3d 1043 (citation and internal quotation marks omitted). And indeed, "loud and boisterous behavior" is a fact that tends to support an officer's reasonable suspicion that a suspect may be armed and dangerous. *Warren,* 2003 UT 36, ¶ 33, 78 P.3d 590.

¶ 13 Officer Anderson described Parke's reaction as "somewhat agitated," which is closer to a nervous response than a boisterous response.[5] People are usually nervous when pulled over by the police, and we think Parke's "agitated" response is entirely understandable when, after being pulled over, he was almost immediately ordered by Officer Anderson to place both hands outside the window—an order he may not have previously encountered during routine traffic stops. If Parke was somewhat alarmed by an unexpected order, we do not think that reaction necessarily indicated that he was armed or dangerous. Further, while Parke questioned

---

**5.** "Agitated" is defined as "moving to and fro: QUIVERING, SHAKING" and as "troubled in the mind: DISTURBED, EXCITED," *Webster's Third New International Dictionary* 42 (1993), and the relevant definition of "nervous" is "ap-

pearing or acting unsteady, irregular, or erratic," *id.* at 1519. The relevant definition of "boisterous" is "noisily turbulent: loudmouthed and rough in behavior: ROWDY, BRAWLING, CLAMOROUS." *Id.* at 248.

the order, he did comply with the order and placed both hands outside the window, showing Officer Anderson that he was not holding a weapon.

¶ 14 The fourth fact, that a stop occurs in a high crime area, is a factor in determining whether a protective frisk is warranted. *See State v. Brake*, 2004 UT 95, ¶ 37, 103 P.3d 699. However, "an area's reputation for criminal activity should not be imputed to an individual"; additional evidence needs to support that the person is engaged in suspect activity. *Holmes*, 774 P.2d at 509 (agreeing with the defendant "that an area's reputation . . . should not be imputed to an individual" but discussing that the facts of the case showed "the police suspected a prostitution deal" based on the behavior observed "in an area known for prostitution activity"). As the United States Supreme Court has observed, "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted." *Maryland v. Buie*, 494 U.S. 325, 334–35 n. 2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990).

¶ 15 In this case, Officer Anderson made the general statement that the area he patrolled was "very dangerous," and the trial court in its factual findings recognized this testimony, stating that Officer Anderson considered "th[e] location . . . a dangerous area for police officers to work." Officer Anderson's testimony and this factual finding, however, do not show that at 9:30 p.m. the gas station (where the traffic infraction occurred) or the movie theater parking lot (where the traffic stop was effectuated) were locations that were known for rendezvous among criminals or for a particular type of criminal activity suggestive of the possibility that Parke might be armed. While Officer Anderson's testimony regarding the dangerousness of his patrol area is a factor to be

considered in the totality of the circumstances analysis, we decline to accept the proposition that such a general notion of dangerousness is enough to support a protective frisk. *See id.*

¶ 16 Furthermore, Officer Anderson mitigated any danger the situation may have presented by ordering Parke to place both of his hands outside the window and then ordering him to step outside the vehicle.[6] *See State v. Warren*, 2003 UT 36, ¶ 22, 78 P.3d 590 (stating that the "inherent dangerousness of traffic stops . . . can be fully or partially mitigated by ordering the occupants out of the vehicle" and that therefore "both the inherent dangerousness of the traffic stop and any reduction in that danger resulting from ordering the occupants out of the vehicle should be factored into the totality of the circumstances analysis"). *See also id.* ¶ 24 (stating that "police officers may order the driver out of the vehicle to promote safety, even in the absence of reasonable suspicion, without violating the Fourth Amendment's proscription against unreasonable searches and seizures").

¶ 17 When Parke placed his hands outside the vehicle, Officer Anderson knew that Parke was not holding a weapon he may have retrieved from his waistband area. When Officer Anderson ordered Parke out of the vehicle, he was able to observe Parke's waistband area to see if there were any weapon-like bulges, and he and his back-up officer were able to fully observe Parke's movements, thus "reduc[ing] the likelihood [they] w[ould] be the victim[s] of an assault." *Id.* ¶ 27 (" '[E]stablishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault.' ") (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)).

---

**6.** The State argues that police officers are not required to adopt alternative means to protect themselves instead of conducting a protective frisk. *See Michigan v. Long*, 463 U.S. 1032, 1051–52 & n. 16, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). We are not suggesting that Officer Anderson was constitutionally required to order

Parke to place his hands outside the vehicle or to order him to step outside the vehicle, although such orders are prudent if an officer is concerned for his or her safety. We are only indicating that when Officer Anderson opted to make those orders, he mitigated any danger that may have been present.

## CONCLUSION

¶ 18 When considering the totality of the circumstances, the facts do not support a conclusion that Officer Anderson had a reasonable, articulable suspicion that Parke was armed and dangerous when Officer Anderson only had a subjective belief or hunch that Parke was armed, Parke's agitated response was not out of the ordinary, and Officer Anderson mitigated the danger that may have been present by taking certain precautions when dealing with Parke. We accordingly reverse the trial court's denial of Parke's motion to suppress evidence and remand for proceedings consistent with this opinion.

¶ 19 WE CONCUR: RUSSELL W. BENCH and JUDITH M. BILLINGS, Judges.