2003 UT App 100

**STATE of Utah, Plaintiff and Appellant,**

v.

**Tracy VALDEZ, Defendant and Appellee.**

No. 20010772–CA.

Court of Appeals of Utah.

April 3, 2003.

protective frisk, they were not entitled to require     defendant to empty his pockets.").

Mark L. Shurtleff, Atty. Gen., and Kenneth A. Bronston, Asst. Atty. Gen., Salt Lake City, for Appellant.

Margaret P. Lindsay and Patrick V. Lindsay, Aldrich, Nelson, Weight & Esplin, Provo, for Appellee.

Before Judges DAVIS, ORME, and THORNE.

## OPINION

THORNE, Judge.

¶ 1 The State of Utah appeals the trial court's order suppressing all evidence discovered on Tracy Valdez following an investigatory detention. We affirm.

## BACKGROUND

¶ 2 On February 26, 2001, Officer Bryan Robinson, an officer with the Pleasant Grove Department of Public Safety, drove to the home of Monique Young to execute an arrest

warrant on Ms. Young.[1] After knocking on Ms. Young's door and informing her of the purpose of their presence, Robinson, along with an unidentified officer, agreed to accompany Ms. Young to her bedroom to allow her to dress more appropriately for the weather.[2]

¶ 3 Upon entering the bedroom, both officers saw Valdez, lying face down upon the bed, apparently asleep and covered with either a blanket or a coat. Because Robinson could not see Valdez's hands, he yelled for Valdez to "wake up," and "[l]et me see your hands." Valdez, however, did not respond to Robinson, thus, Robinson grabbed Valdez by the upper arm and began to shake both Valdez and the bed while repeating his demand that Valdez wake up and show his hands. Then, according to Robinson's testimony, Valdez "kind of g[o]t[ ] up and w[o]ke[ ] up," apparently showing his hands in the process, at which time Robinson asked Valdez for some identification. Valdez denied having any identification, prompting Robinson to ask Valdez to provide his name and date of birth. Valdez answered that his name was Sean Tracy Michaels, born December 4, 1961. Robinson called dispatch to check the name Valdez had given for outstanding warrants and to run an NCI check.

¶ 4 However, at some point during this process, Robinson overheard Ms. Young tell the other officer in the room that Valdez was lying. He also heard Ms. Young tell the other officer Valdez's real name. Robinson then asked dispatch to run a check for outstanding warrants and an NCI check on the name provided by Ms. Young. Dispatch informed Robinson that a valid statewide warrant was outstanding for the person named by Ms. Young. Robinson again asked Valdez if he had any form of identification. This time, Valdez produced a Utah State Identification Card identifying him as "Tracy Manuel Valdez" and Robinson placed him under arrest. During the search subsequent to his arrest, Robinson discovered several small baggies hidden beneath Valdez's belt and a metal vial containing the residue of a white crystal substance, later identified as methamphetamine.

¶ 5 Valdez was charged with possession of methamphetamine in a drug-free zone with a prior conviction, possession of drug paraphernalia, and providing false information to a peace officer. Following a preliminary hearing, Valdez filed a motion to suppress, arguing that the evidence underlying the criminal charges resulted from a seizure that was not supported by reasonable articulable suspicion that he, Valdez, had been, or was about to be, involved in any criminal activity. Following a hearing, the trial court granted the motion and suppressed all evidence that resulted from the encounter. The State subsequently dismissed the charges and now appeals the trial court's suppression order.

## ISSUE AND STANDARD OF REVIEW

¶ 6 In challenging the trial court's suppression order, the State argues that the trial court erred in both its factual findings and its conclusions of law. We will reverse a trial court's factual findings only if we conclude that they are clearly erroneous, which requires a demonstration that the "factual findings . . . are not adequately supported by the record." *State v. Troyer*, 910 P.2d 1182, 1186 (Utah 1995). The trial court's conclusions of law, however, are reviewed for correctness. *See id.* Because cases involving search and seizure are fact intensive, we grant the trial court's legal determinations a measure of discretion in applying the standard to the given facts. *See State v. Chapman*, 921 P.2d 446, 450 (Utah 1996).

## ANALYSIS

¶ 7 On July 31, 2001, the trial court issued a suppression order that included detailed findings of fact and conclusions of law. Among the findings material to this appeal, the trial court found that the officers arrived

---

1. The record is silent concerning the basis for the arrest warrant, the nature of Ms. Young's alleged crimes, or whether the officers had some reason to suspect Ms. Young of associating with people who might present some danger to the arresting officers.

2. When Ms. Young answered the door, she was wearing boxer shorts, and presumably a shirt, but was not wearing clothing sufficient to insulate her from the February weather.

at Ms. Young's home with an arrest warrant and that she asked them for permission to retrieve clothing more appropriate for the weather. The officers agreed, conditioned on her allowing them to accompany her. The officers followed Ms. Young into a bedroom, where she was allowed to dress. In the room, the officers noticed a man, Valdez, apparently asleep, lying face down on the bed with his hands obscured from the officers' view. Concerned that they could not see his hands, one of the officers awakened Valdez by yelling at him and shaking him until he roused. After he awoke, and, apparently, turned to see the officers, thus showing his hands, the officers asked for his identification.

¶ 8 Based on these findings, the trial court concluded that the officers detained Valdez at the moment they grabbed and shook him. In support of this conclusion, the trial court cited the following facts: The encounter was in a private home, there were two officers in the room, and Ms. Young was already clearly in custody. However, the trial court continued, the initial detention was justified because the officers' concern for their safety was reasonable given the circumstances. However, the trial court concluded that after Valdez awoke and showed his hands to the officers, their safety concerns were alleviated, and any further detention or investigation of Valdez was unjustified by the circumstances. Thus, asking Valdez for his identification, or for information concerning his identity, was beyond the scope of the reason for the initial detention and any information resulting from the unreasonable extension of the detention must be suppressed.

¶ 9 The State, on appeal, argues:

The trial court failed to recognize that officers reasonably concerned for their safety were authorized to ask defendant to identify himself; even if the officer unreasonably believed defendant to be armed and dangerous, his request for defendant's name was a justifiably minimal intrusion given the circumstances of the encounter.

¶ 10 The Fourth Amendment establishes in the people the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

> "[T]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security[,]' " [which] "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' "

*Maryland v. Wilson,* 519 U.S. 408, 411, 117 S.Ct. 882, 884–85, 137 L.Ed.2d 41 (1997) (citations omitted). We will generally consider the detention of a citizen reasonable, and thereby constitutional, only if the officers involved in the detention can articulate a reasonable suspicion that the person being detained " 'has committed or is in the act of committing or is attempting to commit a public offense.' " *State v. Fridleifson,* 2002 UT App 322, ¶ 8, 57 P.3d 1098 (quoting Utah Code Ann. § 77-7-15 (1999)). Thus, when faced with a question regarding the reasonableness of a seizure, "we must first determine whether the officer's action was ' "justified at its inception." ' If so, we must then consider whether the resulting detention was ' "reasonably related in scope to the circumstances that justified the interference in the first place." ' " *State v. Chapman,* 921 P.2d 446, 450 (Utah 1996) (quoting *State v. Lopez,* 873 P.2d 1127, 1132 (Utah 1994) (quoting *Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968))).

¶ 11 In the instant case, the State concedes that the officers detained Valdez when they took action to rouse him by loudly demanding that he wake up, grabbing his shoulder, and shaking him until he responded.[3] Thus, we must first examine whether the detention was " ' "justified at its inception." ' "[4] *Id.* (citations omitted). Under

---

**3.** "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house...." *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968).

**4.** Contrary to the dissent's assertion concerning our need to address the justification of the initial detention, this issue is properly before this court. While it is clear that the State has no reason to question the justification of the initial detention,

normal circumstances, we would conclude that the detention was not justified, because the officers involved could not, and indeed never attempted to, articulate any facts that would support a reasonable suspicion that Valdez had committed, or was in the act of committing, a public offense at the time of his detention. *See Fridleifson*, 2002 UT App 322 at ¶ 8, 57 P.3d 1098. Absent sufficient facts to support such a suspicion, we would normally conclude that the detention violated Valdez's Fourth Amendment rights and affirm the trial court's order on this ground.

¶ 12 However, due to the specific facts of this case, we must conduct a further examination into the reasonableness of seizing a third party during the execution of an arrest warrant. Our conclusion in this matter is guided by several United States Supreme Court cases, none of which directly address this specific situation, but when read in concert indicate that the limited seizure of a third party during the execution of an arrest warrant may, under certain very limited circumstances, be permissible without the otherwise necessary showing of facts supporting a reasonable suspicion of criminal activities.[5]

¶ 13 We begin by noting that the State's reliance on *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), for a broad, generalized officer safety exception is misplaced. If this case were controlled by *Terry*, the detention would have been unlawful at its outset. *See id.* at 27, 88 S.Ct. at 1883. In *Terry* the court held that

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the

persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. at 1884. Therefore, while officer safety was a concern addressed in *Terry*, the decision did not create a broad or general "officer safety" exception to the requirements of the Fourth Amendment. Nor did *Terry* in any way eliminate the requirement that an officer must first be able to articulate specific facts to support a reasonable suspicion of criminal activity before making further inquiries of the suspect. Thus, we must look elsewhere to determine the legality of the officers' initial detention of Valdez.

¶ 14 In *Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Supreme Court reviewed a state court decision permitting the search of a defendant while he was "on premises being searched pursuant to a search warrant, to protect [police officers] from attack or to prevent the disposal or concealment of anything described in the warrant." *Id.* at 87, 100 S.Ct. at 340; *see also id.* at 89–90, 100 S.Ct. at 341. Underlying the state court's determination was a state law permitting police to detain and search persons found on premises subject to

---

Valdez not only has reason, but does in fact question the justification of the initial detention. This court has a long history of addressing material points raised by an appellee in response to arguments made by an appellant. Moreover, the dissent's position shirks our duty to consider whether the actions of the officers in this case were " ' "reasonably related in scope to the circumstances that justified the interference in the first place." ' " *State v. Chapman*, 921 P.2d 446, 450 (Utah 1996) (quoting *State v. Lopez*, 873 P.2d 1127, 1132 (Utah 1994) (quoting *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1878–79, 20 L.Ed.2d 889 (1968))). To properly make this determination, we must first determine what justified the initial detention, which in turn requires

an examination of the reasonableness of the initial detention.

5. This limited detention does not grant the police license to conduct an investigation of the third party, absent a reasonable suspicion that the third party has been or is involved in a criminal activity. *See Chapman*, 921 P.2d at 450. The State's argument that knowledge of the third party's identity, and the resulting background check for outstanding warrants and criminal history, is vital to insuring the safety of the officers was not established in this fact situation or in the case law. *See State v. Johnson*, 805 P.2d 761, 763–64 (Utah 1991).

a search warrant. *See id.* at 89, 100 S.Ct. at 341. On review, the Supreme Court held that while the search warrant was supported by probable cause, the specific search of the defendant was not. *See id.* at 90–91, 100 S.Ct. at 342. In so holding, the court concluded that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Id.* The court went on to state that "[t]his [probable cause] requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another...." *Id.* Thus, the court determined that the searches of the defendant violated both the Fourth and the Fourteenth amendments and reversed the judgment of the state court. *See id.* at 97, 100 S.Ct. at 345. The court did not, however, address the propriety of a non-investigative detention of a person while a search warrant was executed.

¶ 15 Later, in *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), the court did address the issue of the propriety of temporarily seizing persons found on premises subject to a search warrant. *See id.* at 695 n. 4, 101 S.Ct. at 2590 n. 4. *Summers* arose when "police officers were about to execute a warrant to search a house for narcotics" and they encountered the defendant, an occupant of the house, outside. *Id.* at 693, 101 S.Ct. at 2589. The officers asked the defendant to assist them in gaining entry to the house, and then detained him while they searched the house.[6] *See id.* After examining a long line of seizure cases, the court concluded that "[i]f the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search his home." *Id.* at 704–05, 101 S.Ct. at 2595 (footnote omitted). The court did not limit the application of this detention power to

merely the owner of the premises. Rather, the court stated that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the *occupants* of the premises while a proper search is conducted." *Id.* at 705, 101 S.Ct. at 2595 (footnotes omitted) (emphasis added).

¶ 16 *Summers*, however, while establishing that under certain limited circumstance police officers can detain a citizen without a reasonable suspicion that the individual is involved in criminal activity, is not dispositive of the present situation. The holding in *Summers* is predicated upon the officers being in possession of a valid search warrant targeted at discovering contraband on the premises, *see id.*, and not on a valid arrest warrant for a third party. And, as the Supreme Court has made clear, "while an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ." *Steagald v. United States*, 451 U.S. 204, 212–13, 101 S.Ct. 1642, 1648, 68 L.Ed.2d 38 (1981).

¶ 17 In *Maryland v. Wilson*, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), the court addressed a situation that more closely resembles the instant case. In *Wilson*, the court was faced with determining the propriety of an officer, in the course of executing a routine traffic stop, ordering the passenger of the automobile to exit the vehicle without an independent reasonable suspicion tying the passenger to criminal activity. *See id.* at 410, 117 S.Ct. at 884. After explaining that "reasonableness 'depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers," ' " *id.* at 411, 117 S.Ct. at 885 (citations omitted), the court determined that, on balance, the intrusion was minimal, and though it was indeed a detention it was not an illegal detention. *See id.* at 414–15, 117 S.Ct. at 886.[7] The court, in

---

6. The police officers detained a total of eight people in the house while they conducted the search. *See Michigan v. Summers*, 452 U.S. 692, 693 n. 1, 101 S.Ct. 2587, 2589 n. 1, 69 L.Ed.2d 340 (1981).

7. The court arrived at the decision after examining the totality of the circumstances, including (1) the absence of any articulable reason to detain the passenger, (2) the fact that the passenger had already been stopped "by virtue of the stop

part, based this decision on the logic underlying *Summers,* and in doing so repeated that " 'the risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.' " *Wilson,* 519 U.S. at 414, 117 S.Ct. at 886 (quoting *Summers,* 452 U.S. at 702–03, 101 S.Ct. at 2594 (footnote omitted)).

■ ¶ 18 Therefore, we conclude that under certain circumstances officers may detain a person without reasonable suspicion of criminal activity for the sole purpose of " 'exercis[ing] unquestioned command of the situation.' " *Id.* However, absent authority to the contrary, *see Wilson,* 519 U.S. at 414–15, 117 S.Ct. at 886; *Summers,* 452 U.S. at 705, 101 S.Ct. at 2595, each situation is subject to a necessity determination through examination of the totality of the circumstances. *See Wilson,* 519 U.S. at 413–14, 117 S.Ct. at 886; *Summers,* 452 U.S. at 701–03, 101 S.Ct. at 2593–95.[8] Thus, we examine the totality of the circumstances surrounding the initial detention of Valdez to determine whether or not the action was " 'justified at its inception,' " *Chapman,* 921 P.2d at 450 (quoting *Lopez,* 873 P.2d at 1132 (quoting *Terry,* 392 U.S. at 9, 88 S.Ct. at 1878–79)), as necessary for the officers to " 'exercise unquestioned command of the situation.' " *Wilson,* 519 U.S. at 414, 117 S.Ct. at 886 (quoting *Summers,* 452 U.S. at 702–03, 101 S.Ct. at 2594 (footnote omitted)).

■ ¶ 19 Here, the record shows that the officers arrived at Ms. Young's home with a valid warrant for her arrest. After informing her of the warrant and their intention to take her to jail, Ms. Young requested permission to retrieve additional clothing and the officers followed her into her home. Upon entering her bedroom, the officers noticed Valdez, lying on the bed with his hands obscured from view. After examining these facts, we conclude that the trial court correctly concluded that the officer's initial detention of Valdez was lawful. Under the circumstances, it was reasonable for Robinson to exercise command over the situation. Detaining Valdez to ensure that no harm came to either the officers or Ms. Young was minimally intrusive, necessary to ensure safety in the situation and thus, not a violation of the Fourth Amendment.[9] The trial court did not find, however, that an investigatory detention, where information of any kind is sought, was necessary to secure the safety of the participants.[10] Therefore, the officer safety justification proffered by the State cannot be extended, no matter how minimally intrusive.

■ ¶ 20 We can find no authority supporting an abandonment of the rule requiring that any further detention or investigation, beyond what is necessary to control the scene, be " ' "reasonably related in scope to the circumstances that justified the interference in the first place." ' " *Chapman,* 921 P.2d at 450 (quoting *Lopez,* 873 P.2d at 1132

---

of the vehicle," (3) the fact that the only change in circumstance involved would be the actual location of the passenger, and (4) by removing the passenger from the vehicle, the passenger was denied access "to any possible weapon that might be concealed in the interior of the passenger compartment." *Maryland v. Wilson,* 519 U.S. 408, 413 414, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997).

**8.** Admittedly, in both *Summers* and *Wilson,* the court created what are best described as "bright line rules" concerning situations similar to the situations presented in those cases. *See Wilson,* 519 U.S. at 414–15, 117 S.Ct. at 886; *Summers,* 452 U.S. at 705, 101 S.Ct. at 2595. However, it is clear to this court, from the context of both decisions, that the reasons underlying the creation of the "bright line rule" rests in the repeatability of those situations, thus avoiding the necessity for examining similar situations on a case-by-case basis.

**9.** We find the boundaries of the situations presented in *Summers* and here to be similar to those defined in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), where the Supreme Court announced the rule permitting an officer to control the "the area from within which [a defendant being arrested] might gain possession of a weapon or destructible evidence." *Id.* at 763, 89 S.Ct. at 2040.

**10.** We distinguish the unlawful nature of the officer's action in the present case, from similar actions that are permitted during the course of a voluntary encounter. During a voluntary encounter an officer is permitted to ask any citizen for information concerning his or her identity so long as the citizen feels free to refuse the request and retire from the encounter unhindered by the officer.

(quoting *Terry*, 392 U.S. at 9, 88 S.Ct. at 1878–79)). Support for this position can be found in *State v. Johnson*, 805 P.2d 761 (Utah 1991), where the Utah Supreme Court "held that running a warrants check on a passenger in an automobile that had been properly stopped exceeded the appropriate scope of detention." *Chapman*, 921 P.2d at 453 (emphasis omitted) (citing *Johnson*, 805 P.2d at 764). Thus, even a "minimal intrusion" requires the police officer to provide a basis for the action. Therefore, absent any specific facts to support a reasonable suspicion of criminal activity on the part of Valdez, Robinson's detention of Valdez was limited to the reason justifying its inception-in this case, controlling the scene.[11]

¶ 21 The trial court found, and we are not presented with a factual basis to disturb its finding, that nothing supported the officers' investigation into Valdez's identity during the detention. The trial court further found that no articulable facts existed to support a reasonable suspicion that Valdez was involved in any criminal activity. Therefore, Robinson's request for Valdez's identification, or, absent that, information concerning his identity, exceeded the scope of the reason justifying the initial detention and unnecessarily expanded its duration and scope. Thus, we conclude that the trial court correctly suppressed any evidence gathered from that point forward.[12]

## CONCLUSION

¶ 22 After examining the totality of the circumstances, and because the police offi-cers possessed a valid arrest warrant for the resident of the home, we conclude that the officers' authority to exercise unquestioned command of the arrest scene extended to the temporary detention of Valdez to ensure he was not in a position to cause harm to either the officers or Ms. Young. However, absent a reasonable suspicion that Valdez had been or was presently involved in a criminal activity, the scope of this detention was limited to ensuring Valdez had no weapon in his hands and was in no position to violently interfere with the arrest. Therefore, we affirm the trial court's decision to suppress the evidence discovered as a result of Officer Robinson's unlawful extension of the scope and duration of the detention. Accordingly, we affirm.

¶ 23 I CONCUR: JAMES Z. DAVIS, Judge.

ORME, Judges (concurring and dissenting).

¶ 24 I concur in the small portion of the majority's opinion devoted to the single issue actually before us on appeal. I dissent from the gratuitous treatment of matters not at issue in this appeal. My limited purpose in writing separately is to call attention to the fact that most of the main opinion is dicta, pure and simple, and thus without any prece-dential value.

¶ 25 It is important to understand that this case is in an unusual posture. It is not the typical Fourth Amendment case in which a defendant appeals, challenging the trial

---

**11.** The State argues that "there is no express evidence that Defendant showed his hands to Officer Robinson or did anything else to allay the officer's concerns for his safety." However, the reason our rules require a party challenging fac-tual findings to marshal all of the evidence and the inferences that can be made from the evi-dence in support of the findings is because it is through this material that we review the find-ings. If, from the inferences alone, we are able to conclude that the findings are not clearly erroneous, we do not need the findings to be supported by direct evidence. Therefore, we conclude that the State's argument concerning the lack of any direct evidence of Valdez's show-ing his hands is without merit.

**12.** The State also argues that the request for Valdez's identification, and the subsequent effort to check for outstanding arrest warrants, was a minimal intrusion. We disagree. We have con-cluded that the minimal intrusion permitted un-der these circumstances ends at the officer's au-thority to detain Valdez to control the situation. As stated clearly in *State v. Johnson*, "the leap from asking for the passenger's name and date of birth to running a warrants check on her severed the chain of rational inference from specific and articulable facts and degenerated into an attempt to support an as yet 'inchoate and unparticular-ized suspicion or "hunch." ' " 805 P.2d 761, 764 (Utah 1991) (citations omitted). Here, the officer's legal authority, absent additional infor-mation, extended only to the temporary deten-tion of Valdez, and Robinson's foray into investi-gation equals nothing more than "an attempt to support an as yet 'inchoate and unparticularized suspicion or "hunch," ' " *id.* (citations omitted), which, much like the officer's actions in *Johnson*, cannot be categorized as a minimal intrusion.

court's conclusion at every step in the analytic chain and necessarily requiring this court to treat each step. *See, e.g., State v. Chapman,* 921 P.2d 446 (Utah 1996); *State v. Leonard,* 825 P.2d 664 (Utah Ct.App.1991), *cert. denied,* 843 P.2d 1042 (Utah 1992). Rather, this is one of those rare appeals by the State. In bringing its appeal, the State agrees with the trial court's initial conclusions, begging to differ only with its last one. And Defendant did not cross-appeal, thereby placing the preliminary determinations in issue. While the preliminary determinations entail admittedly interesting questions, and I can understand the temptation to reach out and provide answers to such questions, a long tradition of self-discipline precludes appellate courts from offering advisory opinions. *See State v. Smith,* 817 P.2d 828, 830 (Utah Ct.App.1991). In the exercise of judicial restraint, appellate courts should limit their decisions to actual controversies. *See State v. Herrera,* 895 P.2d 359, 371 (Utah 1995).

¶ 26 In this case, the State does not disagree with the trial court's decision about when a detention for Fourth Amendment purposes first occurred. Most importantly, the State does not even hint at the possibility that the detention was anything other than fully lawful at its inception. Concomitantly, the State raises no issue about the propriety "of seizing a third party during the execution of an arrest warrant," despite the majority's claim that the "reasonableness" of so doing "must" be examined, ostensibly because of the "specific facts of this case." The only challenge mounted by the State in this appeal is to the trial court's determination that once Defendant's hands were revealed, there was no legal basis on which to extend the detention and require him to produce identification. That is the single issue this court should be addressing, although Judges Thorne and Davis, caught up in discussing the intriguing non-issues, do not even get to it until paragraph 20 of their opinion.

¶ 27 I have no problem whatsoever with the majority's treatment of the issue properly before us, and thus concur in paragraphs 20 and 21 of the lead opinion. I dissent from the balance of the opinion, because such a sweeping foray into Fourth Amendment jurisprudence is not appropriate given the single, simple, straightforward issue raised by the State.