2010 UT App 156

**STATE of Utah, Plaintiff and Appellee,**

v.

**Clay C. LOWE, Defendant and Appellant.**

No. 20090149–CA.

Court of Appeals of Utah.

June 17, 2010.

Shelden R. Carter, Provo, for Appellant.

Mark L. Shurtleff and Marian Decker, Salt Lake City, for Appellee.

Before Judges DAVIS, McHUGH, and THORNE.

## OPINION

McHUGH, Associate Presiding Judge:

¶ 1 Clay C. Lowe appeals from his conviction for possession of methamphetamine, a third degree felony, *see* Utah Code Ann. § 58–37–8(2)(a)(i), (b)(ii) (Supp.2009). Lowe argues that the trial court erred in denying his motion to suppress evidence. We agree and reverse.

## BACKGROUND [1]

¶ 2 On February 24, 2008, Deputy Deke Taylor, a Provo City police officer,

---

1. This case presents us with an unusual preliminary issue. The facts stipulated to by the parties, found by the trial court, and presented in the State's brief on appeal differ in some significant respects from the transcript of the suppression hearing.

Most significantly, neither the trial court's findings nor the parties' appellate briefs refer to Officer Troy Morgan's testimony, noted by the dissent, that he "[took] possession" of Lowe, "had [him] up against [a] vehicle," and "had him by the hands" at the time Lowe turned toward Officer Morgan. Rather, the State's brief indicates that "[Lowe] stood between Officer Morgan and ... Deputy [Deke] Taylor," had "his hands in the air," and "made a 180 degree turn toward Officer Morgan." Furthermore, at oral argument, the State's attorney indicated that this movement was made almost immediately after Officer Morgan came on the scene, with no sug-

went to Lowe's apartment in the hope of obtaining information from his acquaintance, Timothy Lamoreaux, regarding the whereabouts of a fugitive sought by police. When Deputy Taylor approached Lamoreaux, who was standing in an outside doorway of the apartment, Lamoreaux put his left hand in his pants pocket. Deputy Taylor twice ordered Lamoreaux to keep his hands visible, but Lamoreaux refused. Because of Lamoreaux's failure to comply, Deputy Taylor pulled Lamoreaux from the doorway onto the ground and searched him for weapons. He found a butterfly knife with a six-inch blade. As a category-two restricted person, it was unlawful for Lamoreaux to possess the knife. *See* Utah Code Ann. § 76–10–503(1)(b), (3) (2008).

¶ 3 As a second officer, Officer Troy Morgan, arrived on the scene, he saw "Deputy Taylor with his gun out, [Lowe] with his hands in the air, and Lamoreaux not complying." Lowe, who was standing between the two officers, made a 180 degree turn toward Officer Morgan while continuing to hold his hands above his head. Upon seeing the knife retrieved from Lamoreaux, Officer Morgan frisked Lowe's outer clothing, noting a "hard cylindrical object" in Lowe's pocket. Concerned that it might be the handle of a knife, Officer Morgan removed the object, which turned out to be a prescription bottle. In the process of removing the bottle, a baggie containing a crystal substance fell from Lowe's pocket. A field test indicated that the substance was 1.16 grams of methamphetamine.

¶ 4 Lowe was arrested and charged with possession of methamphetamine. After his motion to suppress the methamphetamine evidence was denied, Lowe entered a conditional guilty plea, preserving his right to appeal, *see State v. Sery*, 758 P.2d 935, 939 (Utah Ct.App.1988). The trial court sentenced Lowe to an indeterminate term of zero to five years in prison but suspended the prison term and placed Lowe on probation for thirty-six months. Lowe filed this appeal, challenging his conviction on the ground that the methamphetamine evidence should have been suppressed.

## ISSUE AND STANDARD OF REVIEW

■■■ ¶ 5 Lowe argues that the search by Officer Morgan violated his Fourth Amendment rights under the United States Constitution, *see* U.S. Const. amend. IV, and that, therefore, the methamphetamine evidence should have been suppressed. "In an appeal from a trial court's denial of a motion to suppress evidence 'we review the trial court's factual findings for clear error and we review its conclusions of law for correctness.'" *Salt Lake City v. Bench*, 2008 UT App 30, ¶ 5, 177 P.3d 655 (alteration omitted) (quoting *State v. Tiedemann*, 2007 UT 49, ¶ 11, 162 P.3d 1106), *cert. denied*, 199 P.3d 367 (Utah 2008). "In search and seizure cases, no deference is granted to . . . the district court regarding the application of law to underlying factual findings." *State v. Alverez*, 2006 UT 61, ¶ 8, 147 P.3d 425.

## ANALYSIS

¶ 6 Lowe argues that the officers were not justified in detaining him because he was merely a bystander who was not suspected of criminal activity. He further contends that it was improper to frisk him because Officer Morgan did not have a reasonable suspicion that he was armed and dangerous. *See generally Terry v. Ohio*, 392 U.S. 1, 21, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that an officer is permitted to frisk an individual for weapons if he can "point to specific

gestion that Officer Morgan detained Lowe prior to the turn.

The determination of whether a search or seizure violates the Fourth Amendment is dependent upon the reasonableness of the police officer's action under the totality of the circumstances. *See State v. Baker*, 2010 UT 18, ¶ 10, 229 P.3d 650. Because the dissent evaluates the issues under different facts, it reaches a different result. It is not apparent from the record why the State agreed to facts that differed from those found in the transcript of the pre-

liminary hearing. However, those are the facts found by the trial court and argued by the State on appeal, and neither party challenges those findings. Thus, for purposes of our analysis, we rely on the facts as stipulated to by the parties and found by the trial court. *See d'Elia v. Rice Dev., Inc.*, 2006 UT App 416, ¶ 24, 147 P.3d 515 ("Because the parties do not challenge the trial court's . . . findings of fact, we accept the[ ] findings as true in our analysis on appeal.").

and articulable facts" that lead him reasonably to believe "that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous"). The State disagrees, arguing that the totality of the circumstances justified Officer Morgan's actions.

¶ 7 The Fourth Amendment to the United States Constitution recognizes the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV.[2] In assessing the reasonableness of a search or seizure, we recognize three constitutionally permissible levels of encounters between police officers and citizens:

> (1) [A]n officer may approach a citizen at any time and pose questions so long as the citizen is not detained against his will; (2) an officer may seize a person if the officer has an articulable suspicion that the person has committed or is about to commit a crime; however, the detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop; (3) an officer may arrest a suspect if the officer has probable cause to believe an offense has been committed or is being committed.

*State v. Johnson*, 805 P.2d 761, 763 (Utah 1991) (alteration in original) (internal quotation marks omitted).

¶ 8 Pursuant to this analytical framework, an officer generally cannot detain a person absent at least a reasonable suspicion that the person is involved in criminal activity. *See Sibron v. New York*, 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) (holding that a level three encounter (arrest) requires probable cause); *Terry*, 392 U.S. at 30, 88 S.Ct. 1868 (holding that a level two encounter (investigatory stop) requires reasonable suspicion); *see also Johnson*, 805 P.2d at 763 (stating that an individual should not be detained against his will during a level one encounter). However, "under certain circumstances officers may detain a person without reasonable suspicion of criminal activity for the sole purpose of 'exercising unquestioned command of the situation.'" *See State v. Valdez*, 2003 UT App 100, ¶ 18, 68 P.3d 1052 (additional internal quotation marks omitted) (quoting *Maryland v. Wilson*, 519 U.S. 408, 414, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997)). Such detention has primarily been employed in the case of passengers in the course of a vehicle stop and individuals present during the execution of a search or arrest warrant. *See Michigan v. Summers*, 452 U.S. 692, 705, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981) ("[A] warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." (footnote omitted)); *State v. Baker*, 2010 UT 18, ¶ 13, 229 P.3d 650 ("During a lawful traffic stop, '[t]he temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop.'" (alteration in original) (quoting *Arizona v. Johnson*, — U.S. —, —, 129 S.Ct. 781, 788, 172 L.Ed.2d 694 (2009))); *Valdez*, 2003 UT App 100, ¶ 19, 68 P.3d 1052 (holding that it was lawful for police to detain an individual present in the home where police were arresting another).

¶ 9 Such detention, even if permissible, does not give an officer the authority to frisk for weapons absent a reasonable articulable suspicion that the detained person is armed and presently dangerous. *See Ybarra v. Illinois*, 444 U.S. 85, 92–94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) (holding that it was not permissible for police to indiscriminately search the patrons of a tavern for weapons while executing a search warrant); *Baker*, 2010 UT 18, ¶ 41, 229 P.3d 650 (holding that, although a passenger may be detained for the duration of a lawful traffic stop, "officers may not perform a pat-down search absent reasonable articulable suspicion ... that the suspect is dangerous, and that he may obtain immediate control of weapons" (citations and internal quotation marks omitted)). "We

---

**2.** Although Lowe also cites to the Utah Constitution, he provides no independent analysis of his state constitutional claims. Therefore, we do not consider them. *See State v. Lafferty*, 749 P.2d 1239, 1247 n. 5 (Utah 1988) (noting that appellate courts generally "will not engage in state constitutional analysis unless an argument for different analyses under the state and federal constitutions is briefed").

evaluate the reasonableness of a weapons search objectively according to the totality of the circumstances," *Baker,* 2010 UT 18, ¶ 41, 229 P.3d 650 (internal quotation marks omitted), and will not "divide the facts and evaluate them in isolation from each other," *State v. Warren,* 2003 UT 36, ¶ 14, 78 P.3d 590.

¶ 10 In *State v. Baker,* 2010 UT 18, 229 P.3d 650, the Utah Supreme Court recently considered whether a weapons search was permissible. There a police officer noticed that a vehicle was traveling after midnight without an illuminated license plate, and the officer initiated a traffic stop. *See id.* ¶ 3. After checking the driver's identification, the officer learned that the driver's license had been suspended for a drug violation. *See id.* While the officer was placing the driver under arrest for driving on a suspended license, two backup officers arrived. *See id.* ¶ 4. One of the backup officers approached the vehicle, and the four passengers voluntarily relinquished thirteen knives. *See id.* The backup officer considered the passengers "nonthreatening and cooperative." *Id.* Shortly thereafter, a K–9 unit arrived and the dog alerted on the rear driver's side door of the vehicle and the trunk. *See id.* ¶ 5. At that point, the police officers ordered the passengers out of the vehicle and frisked them. *See id.* The defendant, Baker, was found in possession of controlled substances and arrested. *See id.* One of the issues before the supreme court on certiorari review was whether this court had correctly concluded that Baker's motion to suppress the drug evidence should have been granted. *See id.* ¶¶ 1–2.

¶ 11 In affirming our determination that the frisk of Baker was unreasonable, the supreme court reaffirmed that an officer may not perform a weapons search absent a "reasonabl[e] belie[f] both that the suspect is dangerous, and that he may obtain immediate control of weapons." *Id.* ¶ 41 (internal quotation marks omitted). In reviewing the totality of the circumstances, the *Baker* court considered a number of factors, including the presence of other weapons, the lateness of

the hour, whether the individual cooperated with police, whether the officers actually feared for their safety, whether the individual was suspected of a crime for which he would likely be armed, and whether the circumstances were inherently dangerous.[3] *See id.* ¶¶ 44–52. The supreme court concluded that under the facts present in *Baker,* the weapons search was not objectively reasonable. *See id.* ¶ 55.

¶ 12 The circumstances present here are much less compelling than those present in *Baker.* There, the police officers were engaged in an inherently dangerous traffic stop. *See id.* ¶ 16. *See generally Johnson,* 129 S.Ct. at 788 (noting the inherent danger involved in traffic stops). And Baker was a passenger in the vehicle with a lesser expectation of privacy than an average person. *See Baker,* 2010 UT 18, ¶ 11, 229 P.3d 650. Furthermore, the *Baker* traffic stop was conducted after midnight, and the suspects outnumbered the police. *See id.* ¶¶ 3–4. In contrast, Lowe was frisked at four o'clock in the afternoon in front of his apartment, during what began as a voluntary encounter. At the time Lowe was searched, Lamoreaux was being subdued by Deputy Taylor and Lowe was being detained by Officer Morgan. While the officers in *Baker* recovered thirteen knives, including at least one from Baker, *see id.* ¶ 4, the officers here found a single knife on Lamoreaux, not Lowe. As in *Baker,* Lowe cooperated with the police officers. Lowe kept his hands above his head at all times during the encounter and did nothing to interfere with the officers' seizure, search, and arrest of Lamoreaux. Unlike the defendant in *Baker,* Lowe was not suspected of any crime, let alone a violent crime for which he would likely be armed. *See generally id.* ¶ 51 ("If an officer suspects that an individual has committed, was committing or was about to commit a type of crime for which the offender would likely be armed, the officer automatically has the right to frisk the individual to search for weapons." (internal quotation marks omitted)).

---

3. This list is not exclusive; other factors unique to the circumstances may also be relevant. *See, e.g., State v. Warren,* 2003 UT 36, ¶ 32, 78 P.3d 590 (weighing as part of the totality of the cir-

cumstances the fact that the individual had told officers a verifiable lie about the status of his driver license and that officers encountered the individual in a deserted area).

¶ 13 The only factors supporting the State's assertion that the weapons frisk was reasonable are Officer Morgan's subjective fear for his safety, Lowe's turn toward him, and the discovery of the knife in Lamoreaux's pocket. Although some deference should be given to an officer's subjective belief that a person may be armed and dangerous, that belief must be objectively reasonable. *See id.* Furthermore, Lowe's movement turning toward the arriving officer while continuing to keep his hands above his head seems more a normal reaction to a new development than a threat. *See generally State v. White*, 856 P.2d 656, 661 (Utah Ct. App.1993) (noting that "common gestures or movements" do not indicate that an individual is armed and dangerous (internal quotation marks omitted)). And Officer Morgan made no attempt to assure his safety in a less intrusive way, such as by questioning Lowe about his presence at the scene. *See generally id.* at 662–65 (discussing the responsibility of officers to question before frisking where the circumstances indicate that it would not be dangerous for them to conduct an initial inquiry).

## CONCLUSION

¶ 14 Based on the totality of the circumstances as argued on appeal, we conclude that Officer Morgan did not have an objectively reasonable belief that Lowe was armed and dangerous, thereby justifying a frisk for weapons.[4] Therefore, Lowe's motion to suppress should have been granted.

¶ 15 Reversed.

¶ 16 I CONCUR: JAMES Z. DAVIS, Presiding Judge.

4. Because we hold that the weapons search of Lowe was unreasonable, we need not consider whether, even if it were reasonable, it was tainted by the Deputy Taylor's actions toward Lamoreaux.

1. To this end, I omit the circumstances of Lamoreaux's removal from the doorway and other matters unknown to Officer Morgan when he executed the frisk of Lowe. I note that Lowe makes no argument that events occurring prior to Officer Morgan's arrival on the scene precluded Officer Morgan from relying on his observa-

THORNE, Judge (dissenting):

¶ 17 I respectfully dissent from the majority opinion, as I would affirm the trial court's denial of Lowe's motion to suppress. The majority opinion fails, in my opinion, to evaluate the totality of the circumstances that were apparent to Officer Morgan when he arrived on the scene and proceeded to frisk Lowe for weapons. When all of the facts and circumstances available to Officer Morgan are considered, I must disagree with the majority opinion's conclusion that he lacked a reasonable belief that Lowe was armed and dangerous. To the contrary, the totality of the circumstances made it eminently reasonable for Officer Morgan to conduct himself in the belief that Lowe "[was] dangerous, and that he [might] obtain immediate control of weapons," *see State v. Baker*, 2010 UT 18, ¶ 41, 229 P.3d 650 (internal quotation marks omitted). For this reason, I dissent.

¶ 18 I begin with a summary of the facts and circumstances known to Officer Morgan when he made the decision to frisk Lowe.[1] Based on a stipulation between the parties, the trial court adopted the fact statements contained in the State's opposition memorandum, which described Officer Morgan's interaction with Lowe as follows:

> Just after Deputy Taylor forced Lamoreaux to the ground, Provo Police Officer Troy Morgan arrived, having been dispatched to assist with a warrant service. Officer Morgan heard Deputy Taylor yelling as he approached the area. When he arrived, he saw Deputy Taylor with his gun out, one individual on the ground and at least one other individual ( [Lowe] ) present and unrestrained. Officer Morgan accordingly made contact with [Lowe]. As he did so, Deputy Taylor was removing [a] knife from Lamoreaux's pants pocket. At

tions upon his arrival as part of his overall assessment of the need to frisk. Accordingly, I view facts that were not known to Officer Morgan at the time of the frisk to be irrelevant to the analysis of the reasonableness of Officer Morgan's beliefs. *Cf. State v. Friesen*, 1999 UT App 262, ¶ 12, 988 P.2d 7 ("In determining whether this objective standard has been met, the focus necessarily centers upon the facts *known to the officer* immediately before the stop." (emphasis added)).

that moment, [Lowe] "turned into" Officer Morgan, immediately causing Officer Morgan to suspect that [Lowe] also had a weapon and to fear for his safety.

¶ 19 If this were the full extent of the facts presented to the trial court, I might be persuaded to join my colleagues' appraisal of the reasonableness of Officer Morgan's beliefs about Lowe. However, Officer Morgan's undisputed testimony at the preliminary hearing contained significant additional facts that clearly justified his frisk of Lowe. The trial court's truncated summary of the facts as adopted by the parties is not inconsistent with the remainder of Officer Morgan's testimony, nor did the trial court give any indication that Officer Morgan lacked credibility— to the contrary, the trial court repeatedly referred to Officer Morgan's testimony throughout its oral ruling on Lowe's motion.[2] Accordingly, I look to the transcript of the preliminary hearing to flesh out the totality of the circumstances presented to the trial court. Cf. *Bill Nay & Sons Excavating v. Neeley Constr. Co.*, 677 P.2d 1120, 1121 (Utah 1984) ("Where the written findings are incomplete, inadequate, or ambiguous, as in this case, they may be elaborated or interpreted (in respects not inconsistent therewith) by reference to the trial court's written memorandum or its oral explanation of the decision.").

¶ 20 Officer Morgan testified that he was dispatched "to assist Utah Major Crimes with a possible warrants service" and that "the individual that they were going to make contact with has a flight risk, and is also a violent person, and will resist officers at the scene." When Officer Morgan arrived on the scene and was approaching on foot, he heard Deputy Taylor "yelling, 'Stop resisting. Show me your hands. Get on the ground,' several times." Officer Morgan and his backup officer ran to Deputy Taylor's assistance, where Officer Morgan saw that Deputy Taylor "had two individuals at gunpoint.

One of the individuals [was] on the ground resisting." On cross-examination, Officer Morgan specifically agreed that Deputy Taylor had his gun pointed at Lowe while he was scuffling with Lamoreaux. Deputy Taylor and the third officer subdued and searched Lamoreaux, while Officer Morgan "[took] possession" of Lowe and "had [him] up against [a] vehicle." Lowe was wearing a jumpsuit with a jacket over the top of it, and Officer Morgan testified that Lowe's clothing could have concealed a weapon. As Deputy Taylor discovered and removed a large knife from Lamoreaux, Lowe "turned around into [Officer Morgan]." Lowe had his hands up at the time and Officer Morgan "had him by the hands." Officer Morgan testified, "I was standing. His back was to me. He turned 180 degrees to face me.... I just turned him back around." Officer Morgan then frisked Lowe and, in the course of the frisk, discovered methamphetamine on his person.

¶ 21 Generally speaking, "police may conduct a protective frisk only when they have reasonable suspicion that the detained individual is armed and dangerous." *State v. Peterson*, 2005 UT 17, ¶ 10, 110 P.3d 699; see also *Terry v. Ohio*, 392 U.S. 1, 26–27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "[T]he officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 26, 88 S.Ct. 1868. "Whether an officer has reasonable suspicion to subject an individual to a ... frisk is 'evaluated objectively according to the totality of the circumstances.'" *Peterson*, 2005 UT 17, ¶ 11, 110 P.3d 699 (quoting *State v. Warren*, 2003 UT 36, ¶ 14, 78 P.3d 590). Considering the *totality* of the circumstances described by Officer Morgan, I have little difficulty in concluding that he had an objectively reasonable belief that Lowe presented a danger and that, therefore, his frisk of Lowe was consti-

2. I additionally note that the same trial court judge presided over both the preliminary hearing and oral argument on Lowe's motion; that the two hearings were held a scant five weeks apart; and that, at oral argument, the trial court repeatedly and expressly relied on Officer Morgan's testimony, as reflected in the court's own notes from the preliminary hearing, to discuss facts outside those agreed to by the parties. For example, the stipulated facts included only that "Deputy Taylor [had] his gun out," while the trial court observed that its notes indicated that Lowe "had a gun trained on him."

tutionally permissible. There are four areas of Officer Morgan's testimony that, in my opinion, demonstrate that he had the requisite justification to frisk Lowe.

¶ 22 First, before Officer Morgan even arrived on the scene, he was informed by dispatch that he was being called to assist "Utah Major Crimes" in possibly serving a warrant and that the individual involved was "a violent person, and will resist officers." While this information apparently (and somewhat accurately) referred to Lamoreaux, there is no indication in the record that Officer Morgan knew that Lowe was not the violent person described by dispatch until after the frisk occurred. To the contrary, when asked if he had received a report about Lowe prior to his arrival on the scene, Officer Morgan responded, "There were multiple suspects at the scene. His identification wasn't determined at the time."

¶ 23 Second, as Officer Morgan was approaching the scene on foot, he heard Deputy Taylor "yelling, 'Stop resisting. Show me your hands. Get on the ground,' several times." Unsurprisingly, this indicated to Officer Morgan that Deputy Taylor "was in some sort of trouble, and that he was being fought with." Again, as Officer Morgan approached, he had no way of knowing whether Deputy Taylor was fighting with one or more individuals or the identity of any of those individuals.

¶ 24 Third, when Officer Morgan ran to assist Deputy Taylor and first observed the altercation, Deputy Taylor was pointing his gun at Lowe with one arm while scuffling with Lamoreaux with his other arm. In other words, when presented with an actively resisting individual, Deputy Taylor chose *not* to use both arms to subdue that individual but rather felt a need to use one arm to hold Lowe at gunpoint. Certainly, this indicated to Officer Morgan that *Deputy Taylor* believed that Lowe constituted a danger, just as surely as if Deputy Taylor had verbally indicated such a belief.[3] At the very least, Deputy Taylor's holding Lowe at gunpoint

gave Officer Morgan reasonable grounds to believe, correctly or incorrectly, that Lowe had been part of the altercation that led to Deputy Taylor's yelling and that Lowe presented a potential threat until Officer Morgan could determine otherwise.

¶ 25 Finally, there is Lowe's "turning into" Officer Morgan, the majority opinion's description of which is substantially at odds with Officer Morgan's actual testimony. The majority opinion describes the incident as, "Lowe, who was standing between the two officers, made a 180 degree turn toward Officer Morgan while continuing to hold his hands above his head." *See supra* ¶ 3. While I agree that Lowe's hands were apparently in the air throughout the incident, Officer Morgan testified that he had taken possession of Lowe, had him up against a vehicle, and had him "by the hands" when Lowe turned 180 degrees to face him, apparently in response to the discovery of the knife on Lamoreaux. Under these circumstances, Lowe's movement seems much more resistive or threatening, and much less like the common gesture or movement described by the majority opinion. *See generally State v. Schlosser*, 774 P.2d 1132, 1138 (Utah 1989) (concluding that a suspect's "common gestures and movements" did not give rise to reasonable suspicion).

¶ 26 When these four factual circumstances are added to the general description of events adopted by the trial court and described by the majority opinion, the objective reasonableness of Officer Morgan's actions becomes imminently apparent. Officer Morgan was dispatched to the scene with a warning that violent resistance was likely, heard such resistance occurring as he approached, arrived to witness Deputy Taylor holding Lowe at gunpoint while struggling with Lamoreaux, and then had Lowe turn into him while in his physical grasp as a weapon was being secured from Lamoreaux. This is not, in my opinion, a close call.

¶ 27 Nor am I persuaded by the majority opinion's suggestion that Officer Morgan was

---

3. Even without considering Deputy Taylor's need to restrain Lamoreaux, it seems beyond dispute that a peace officer should have good reason to hold a citizen at gunpoint and that a second officer arriving to find a suspect held at gunpoint can reasonably assume there is some justification for the first officer's threat of deadly force.

required to attempt to resolve his fears through questioning rather than by means of a frisk. *See supra* ¶ 13. *See generally State v. White,* 856 P.2d 656, 662–63 (Utah Ct.App. 1993) (discussing reasonable inquiry in the frisk context). Although there are certainly cases where questioning might appropriately resolve safety concerns, "an officer may forego [such] initial inquiry when, because of specific circumstances, questioning would be dangerous to the police officer." *White,* 856 P.2d at 662. Here, the situation involved actual violence against an officer, the appearance that Lowe was potentially involved in that violence, Deputy Taylor's deployment of a deadly weapon to control the situation, and some resistive movement by Lowe coincident with the disarming of Lamoreaux. In my opinion, Officer Morgan's decision to frisk Lowe rather than question him was completely justified in light of, in the words of the trial court in its oral ruling, "the volatility of the circumstances."

¶ 28 For these reasons, I believe that the totality of the circumstances known to Officer Morgan at the time of the frisk gave him an objectively reasonable belief that Lowe was armed and dangerous. Accordingly, I would affirm the trial court's denial of Lowe's motion to suppress, and I must respectfully dissent from the majority opinion.